Charles A. Thomson v. Commissioner.
Thomson v. Commissioner
Docket No. 23203.
United States Tax Court
1951 Tax Ct. Memo LEXIS 353; 10 T.C.M. (CCH) 82; T.C.M. (RIA) 51019; January 18, 1951
*353 Norman I. Katz, Esq., and Zivel B. Niden, C.P.A., 11 W. 42nd St., New York, N. Y., for the petitioner. Robert M. Willan, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner contests a deficiency in income tax of $145.61 for 1945. Respondent admits error in disallowing a deduction for driver's license fee. The only question is the deductibility as bad debts of petitioner's claims against four Fire Department employee associations for retirement benefits. Findings of Fact Petitioner filed his Federal income tax return for 1945 with the collector for the fourteenth district of New York. On October 1, 1942, petitioner retired as Chief of Battalion from the New York City Fire Department, hereinafter called the fire department, after about 35 years' service. At the time of his retirement, petitioner was a member of five unincorporated associations whose membership was limited to employees of the fire department. The associations were Chief Officers' Association; Officers' Associations; Captains' Association; Uniformed Firemen's Endowment Association, known as an hereinafter called the first endowment; and Fire Department *354 Endowment Association, known as and hereinafter called the second endowment. Petitioner joined the associations at different dates ranging from 1908 to 1930, during his service with the fire department. Each association held regular meetings which were attended by only a few members. According to their constitutions and by-laws, the annual dues of the associations ranged from $1 to $24, and the "assessments" to be levied at a member's death or retirement from 10 cents to $5. Petitioner's total payments in dues and assessments were about $450 to the Captains' Association; $598 to the Officers' Association; $1,038 to the first endowment; $1,134 to the second endowment; and an undisclosed sum to the Chief Officers' Association. According to the constitutions, the total retirement benefits to be paid a retired member were 80 per cent of the amounts assessed, with no stated limits, in the Chief Officers' Association and the first endowment; $700 for the Officers' Association; and a maximum of $500 for the second endowment. The members of each association elected a delegate who was authorized to collect the assessments levied from time to time. They sent the amounts collected to the *355 association's financial secretary who was authorized to pay the benefits due. The remainder of the assessments collected, usually about 20 per cent, was retained for payment of the association's operating expenses. The associations had no reserves. In 1942 and the years which followed, abnormally large numbers of members of each association became eligible for retirement benefits. Since the associations had insufficient funds to pay all the benefits and the remaining members refused to pay increased assessments levied to make up the deficits, each association had a long waiting list at the time of petitioner's retirement. It was the practice of each association to give payment of death benefits precedence over retirement benefits. A member's name, or that of his beneficiary, was added to the waiting list during the month following his death or retirement. By 1944 a large number of suits brought against the associations in New York City municipal courts by benefit claimants caused the intervention of the State Insurance Department to protect other waiting claimants. Except for the Captains' Association, which agreed with its claimants on reduced benefit payments, all of the associations *356 went into bankruptcy administered by the Insurance Department as trustee. Petitioner founded and became president of an organization in New York City which included as members all retired firemen. The organization employed a lawyer named Taft to attempt recovery of the claims through the Insurance Department. Some of the associations had invested in mortgages, stocks and bonds which had to be sold by the Insurance Department as part of the bankruptcy liquidation. Robert E. Dineen, Superintendent of Insurance of New York, filed in the Supreme Court for Ew York County a separate "first and final report, audit, and petition," hereinafter called the reports, for each of the associations. As disclosed by the reports, dates of filing and the amounts of petitioner's benefit claims disallowed and allowed are as follows: Association
Date of Report
Claim
Disallowed
Allowed
Chief Officers'
Dec., 1945 $780 $40 $740
Officers'
July, 1946
700
700
First Endowment
Apr. 2, 1945
725
375
350
Second Endowment
Oct. 30, 1947
600
75
525
By separate orders, a justice of the New York Supreme Court approved each of the reports. In 1944 petitioner was *357 notified by the Insurance Department that the superintendent of insurance had taken over the associations. In 1944 petitioner consulted a certified public accountant named Zivel B. Neiden in connection with preparation of his income tax return. Neiden applied to the Insurance Department for information concerning the financial condition of the associations but received the report: "No information available; condition unknown." At the end of 1944 Neiden had no information respecting the ability of the associations to meet the benefits due. He did not examine any of the associations' records in 1944 or 1945 because "they were not available for examination." Neiden prepared petitioner's return for 1945. In the return petitioner's occupation was listed as "insurance inspector" for Vlachos & Co. with income of $2,200. He reported "income from annuities or pensions" of $2,721.92 from which he deducted $1,000 as "loss on insurance endowments per schedule." The schedule included in the return was as follows: "Losses on Non-Business Bad Debts
Chief Officers Assn.
$ 500.00
Uniform Officers
728.00
First Endowment
459.79
Captains Assn.
158.00
2nd Endowment
550.00
$2,395.79
Claimed 1944
1,000.00
Claimed 1945
1,000.00
2,000.00
Balance
$ 395.79
*358 "The above Fire Department organizations are in the hands of the State Insurance Fund for liquidation. The above amounts were paid for endowments, matured but now unpaid. Amount of collection unknown. Partial loss claimed to maximum amount allowable of $1,000.00." The $158 deducted for "Captains Assn." represented the difference between the amount which petitioner accepted from that association as payment of benefits and the total amount due. Respondent now concedes that the $158 was a proper deduction for 1944. In his returns for 1947 and 1948 petitioner reported as income "certain sums of money" which he received in those years "as dividends in liquidation of these associations * * * from the State Insurance Department, through Mr. Taft." In his notice of deficiency respondent disallowed $580.46 of the $1,000 deduction claimed for 1945 with the explanation: "Loss claimed in the amount of $580.46 on Fireman's Endowment has been disallowed * * *." The $419.54 allowed by respondent as a deduction for 1945, being the difference between the $1,000 claimed and the $580.46 disallowed, represents the $459.79 claimed as a deduction for the first endowment less a final liquidation *359 dividend of $40.25 received by petitioner from that association in 1945. Opinion Petitioner's claim to a deduction of nonbusiness bad debts involves certain Firemen's Benefit Associations to which membership dues and assessments had been paid over a long period of time. As to one of the associations, the so-called first endowment, the full amount claimed less recoveries in the tax year has apparently been allowed. As to another, the Captains' Association, respondent now concedes that the amount deducted was proper, but contends that the similar deduction taken for 1944 and allowed in that year must be viewed as including the bad debt from the Captains' Association since this was the actual year of loss. In this he seems to be borne out by the opening statement of petitioner's counsel [1] and in any event there is no evidence from which we can find that this indebtedness if worthless in 1945 was collectible in 1944. This leaves the remaining three association for which in effect no deduction for either year has been specifically *360 permitted. [2] In this respect also we are unable to find evidence in the record demonstrating that the respondent's action was incorrect. There was evidence, as our findings indicate, that in subsequent years some amounts were collected from these associations. Even if these indebtednesses were partially worthless in 1944 or 1945 (but see section 23 (k) (4), Internal Revenue Code), there is nothing from which we can determine the extent of worthlessness on the one hand or of subsequent collectibility on the other, and especially we are not advised whether the unattributed remainder of the 1944 deduction [3] was not adequate to cover all ultimate uncollectibility. It follows that the burden of proving respondent's determination to be erroneous has not been borne. To permit adjustment for the disallowed driver's license fee, Decision will *361 be entered under Rule 50. Footnotes
1. "Actually, the really identifiable events took place in 1944, and some in early 1945 - that is, the assumption of control by the insurance commissioner."↩
2. Since petitioner deducted the full permissible thousand dollars in 1944, of which only $158 can be attributed to the Captains' Association, and none to the first endowment, the balance of $842 was in effect allowed as a general deduction against the indebtedness of the three remaining associations. ↩
3. See footnote 2.↩